Oswego General Term, May, 1850.    *Gridley, Allen, and Hubbard,* Justices.

Daniel McKillip, adm'r, &c. of A. McKillip, deceased, and committee of James McKillip, a lunatic, *vs.* Mary McKillip and others.

A lunatic, by the appointment of a committee, loses none of his estate, rights of property, or rights of action. All suits affecting his person or property must be prosecuted in his name, except those which are authorized by statute to be brought in the name of the committee.

In an action upon a bond conditioned for the support and maintenance of the obligee and his lunatic son, brought by a person who had furnished supplies to the obligee and his son, it is not a sufficient breach to alledge that the obligee and his son, after the death of the obligor, went to the plaintiff's to reside, and were there supported; without any averment of a request that the defendants would perform the condition of the bond, or of their refusal or neglect to do so, except that the administratrix of the obligor had refused to pay the plaintiff's account for support and maintenance.

Where a bond is conditioned for the support and maintenance of the obligee and his lunatic son, during life, and to furnish them with good and sufficient nursing and medical attendance, washing and lodging, both in sickness and in health, the obligor is only bound to maintain and support the obligee and his son, at his own dwelling house; provided it can there be done in a suitable manner, which will be presumed. And after the decease of the obligor, the family residence, so long as it is maintained, is the place of support.

Such a bond is not a money bond, though it may perhaps become so, by breach, in which case a pecuniary liability arises.

The doctrine of equitable lien upon land sold, for the purchase money, should not be extended beyond the vendor and vendee and privies in estate or in law; and then only for unpaid purchase money.

Thus where A. conveys land to B. and in consideration thereof B. covenants with A. to support and maintain him and J. his lunatic son, the covenant creates no lien upon the land, in favor of J.

Where a covenant of the vendee is substituted for the purchase money, or as a mode of payment of the price of the land, the land should be held discharged of the lien.

Accordingly, where a vendee, by his bond, reciting the conveyance of the land to him as the consideration of such bond, covenanted to maintain the vendor and his son J. during their natural lives; *Held* that the covenant was the substituted consideration for the purchase money, and that the bond was not an equitable incumbrance on the land, in behalf either of the obligee, or of his son J., who was merely a beneficiary.

McKillip *v.* McKillip.

IN EQUITY.    This was a suit in equity, commenced prior to the code of 1848, founded upon a bond of which the following is a copy.   "Know all men by these presents that I John Mc-Killip am held and firmly bound unto Archibald McKillip, my father, in the sum of two thousand dollars, lawful money of the state of New-York, to be paid to the said Archibald, his executors, administrators or assigns, to which payment well and truly to be made, I bind myself, my heirs, executors and administrators, and each and every of them firmly by these presents. Sealed with my seal, and dated this tenth day of November, 1846. Whereas the above named Archibald McKillip *has this day conveyed* to the above bounden John McKillip, his heirs and assigns, lot No. 53 and the south half of lot No. 55, in Lindsley's patent, in Cherry Valley, in the county of Otsego, being the *consideration of this bond or obligation.*   Now the condition of this bond or obligation is such, that if the said John McKillip, his heirs, executors or administrators, shall and do at all times hereafter *maintain, support and clothe the said Archibald Mc-Killip and his son James,* who is now ill and deprived of his reason, during their natural lives and during the natural life of the longest liver of them, and furnish good and sufficient nursing and medical attendance, washing and lodging, both in sickness and health, for each of them during the term aforesaid, then this obligation to be void and of none effect, otherwise to remain in full force and virtue.

(Signed)            JOHN McKILLIP.  [L. S.]"

Both the obligor and obligee named in the bond died before the commencement of this suit.   The defendants were the widow and heirs at law of John McKillip the obligor.   The plaintiff prosecuted as administrator of Archibald the obligee, and also as committee of the lunatic, James, named in the bond. In the bill of complaint it was alledged "that Archibald Mc-Killip, in the early part of the month of April, 1847, came to the plaintiff's in the town of Cherry Valley, to reside in the plaintiff's family, and there resided until on or about the 6th day of May then next following, when he departed this life; and that during the period of such residence, the plaintiff pro-

vided him with board and lodging, and procured for him medi-
cal attendance and nursing during the illness which preceded
and which terminated with his death, and that after the death
of the said Archibald McKillip, the plaintiff paid the expenses
of his funeral and burial. And the plaintiff further shows unto
the supreme court that when the said Archibald McKillip came
to reside in his family as aforesaid, he brought with him his in-
sane son James, to be boarded and taken care of by him, and
that the said James has since that time continued to board with
and to be taken care of by the plaintiff."

The complaint contained a statement of the items of main-
tenance and support furnished by the plaintiff for Archibald and
James, including an item of $50 expenses in procuring his ap-
pointment as committee, amounting in all to the sum of $201.
The account, it was alledged, was presented to the defendant
Mary McKillip, the widow and administratrix of the estate of
the obligor of the bond, for payment, and then the complaint
proceeded to charge " that on being requested, on the 7th day
of June aforesaid, to pay the said account, she refused to pay
the same, or any part thereof, and that the same remains wholly
due and unpaid *to the plaintiff.*" The prayer for relief was as
follows : " That payment may be decreed to be made of the
amount which the plaintiff is justly entitled to demand and re-
ceive on account of the indebtedness herein before set forth, and
in default of such payment, that all and singular the real estate
aforesaid, (referred to in the bond,) may be sold under the di-
rection of this court, and out of the money arising from such
sale that he may be paid the amount that may be so decreed to
be paid to him as aforesaid, together with the costs of this suit;
and that in the decree aforesaid, and in the ordering the dispo-
sition of the proceeds of the sale of the said premises as so charged
as aforesaid, with the *equitable lien,* suitable provision may be
made for the securing and enforcing the future fulfilment of the
condition of the said bond, and the payment of all liabilities
that may hereafter accrue on account thereof."

It appeared in the evidence that John McKillip, the obligor
in the bond, had from the time of making this family arrange-

McKillip *v.* McKillip.

ment, and up to his death, maintained his father and brother at the homestead upon the premises conveyed as the consideration of the bond, and after his death the defendants as his widow and heirs at law, offered to continue such maintenance according to the condition of the bond, at the residence of the defendants, but that Archibald, declining such arrangement, left with his lunatic son, voluntarily, and went to reside with, and was supported by, the plaintiff. This was done without the consent or approval of the defendants.

The case came before this court upon appeal from the decision of Justice Morehouse, dismissing the bill of complaint

*De Witt C. Bates,* for the plaintiff.

*C. P. Kirkland,* for the defendants.

*By the Court,* HUBBARD, J. The principal question dis- cussed upon the argument, was in relation to the equitable lien of the bond upon the premises conveyed as its consideration. There are, however, *in limine,* two fatal objections to the maintenance of this suit. 1st. The defect of parties plaintiff, and 2d, there is no proper averment in the complaint, or evidence, of the breach of the bond. As to the first, the suit is improperly brought in the name of the plaintiff as *committee* of the lunatic James. It should have been brought in the *name of the lunatic,* for whose benefit it is assumed to be prosecuted. No rule of law is better settled than that a lunatic, by the appointment of a committee, loses none of his estate, rights of property, or rights of action. All suits affecting his person or property must be prosecuted in his name, except those provided for by chapter 112, page 90, of session laws of 1845. That statute, it seems, was passed with direct reference to this settled rule of the common law, and was intended to obviate some inconveniences experienced, by authorizing the committee to sue in their own names for any debt, claim, or demand transferred to them, or to the possession and control of which they became entitled as such committee. The statute does not embrace an equitable pro-

ceeding like this, by which an estate or interest in real property is sought to be established. The doctrine on the subject of making the lunatic a party, is fully elucidated in *Lane* v. *Schermerhorn*, (1 *Hill*, 97,) and in the cases there cited.

The second ground of objection is equally fatal to the maintenance of the suit. The complaint was demurrable in not alledging a sufficient breach of the bond. It simply avers, in substance, that the obligee Archibald, after the death of the obligor, went to the plaintiff's to reside, taking with him his lunatic son, and that they were there supported. There is no allegation of a request that the defendants would perform the condition of the bond, or their refusal or neglect to do so, except that the defendant Mary McKillip refused to pay the account for support, &c. as presented by the plaintiff. These allegations do not set forth a cause of action, even if the defendants were properly prosecuted in their individual names as the widow and heirs of the deceased obligor. Neither does the *proof* show any legal breach. The abandonment of the defendants, by Archibold and his son James, the refusal longer to remain at the family residence, and be supported by the defendants, was voluntary and without reasonable excuse, and the plaintiff was warned that any maintenance furnished by him would be considered *gratuitous.* If the plaintiff is remediless, he has no ground of complaint.

By the condition of this bond, it seems to me that the obligor was only bound to maintain and support the obligee and the lunatic at his dwelling house, provided it could there be done in a suitable manner, which will be presumed. This is not a money bond, although it may perhaps become so by breach, when a pecuniary liability arises. The obligation is to *furnish* Archibald and James with the necessary *articles* of personal want, with food, raiment, a *house,* and to bestow that *personal attention* and those social charities which the infirmities of age and mental imbecility demand. These duties can not be performed except under the roof and within the family circle of the obligor or his representatives. Looking at the situation of the parties, and the relations existing, it is manifest that the

McKillip *v.* McKillip.

*intent of the bond* was that Archibald and James should become and remain inmates of the family of John the obligor, and that he was to support and provide for them at his own house.   After his decease, the family residence, so long as it was maintained, was obviously intended as the place of future support.

The plaintiff has plainly misconceived the real object and intent of this family arrangement, and has erroneously regarded this as a money bond, and that the residence of Archibald and James was a matter discretionary with them, or subject to the interference of any third person.   But if he is right in the principle of the bond and in this suit, still the refusal of the widow, although administratrix of the obligor, to pay the account presented, could not be charged as a breach.   She could not, by her acts, bind the heirs who are made co-defendants, some of whom are infants, and there is no privity of interest, or connection of the plaintiff (for whose individual benefit this suit seems mainly to be brought,) with this bond, so as to make her refusal under the circumstances, of the least importance in establishing a right of action.   There must have been a breach *prior to the accruing of the account* sought to be recovered.   In the absence of any averment in the complaint, or proof, of such breach, this suit can not be sustained.

The important question presented upon the argument was that in relation to the *equitable lien.*   From the view of the case already taken, it is only necessary to consider this branch, with reference to the future rights and proceedings of the parties.

The doctrine of lien in favor of the vendor of real estate, for unpaid purchase money, is well settled.   Equity raises an implied trust; the vendee in legal presumption becomes the trustee of the vendor to the extent of the purchase money unpaid.   This principle is founded in natural equity, and the lien may be enforced in all cases where this implied trust is not discharged by positive agreement, or by the taking some independent covenant or collateral security.   It is not important to inquire whether Archibold, the obligee, could, if living, enforce this lien. The question now is whether it can be *asserted by James,* or for his benefit.   Upon principle and authority I think no such

equitable lien exists in his behalf.  He is merely a beneficiary in the bond : he is not the vendor, neither is he a party to the conveyance, or privy to either of the parties or to the estate. That he is a son of the vendor and brother of the vendee does not alter his legal relation to the transaction.  The covenant in the bond is available to him, but it is as an independent covenant, and he can not look beyond the personal responsibility of the obligor, for its performance.  In no sense can it be said that any purchase money has been withheld from him, nor does he prosecute as the heir, representative or creditor of the vendor; and hence no implied trust can arise in his behalf.

In the case of *Clark* v. *Royle*, (3 *Simons' R.* 499, *cited in* 2 *Story's Eq. Jur.* 655, § 1227, *note* 2,) it was decided "that where A. conveyed an estate to B., and in consideration thereof B. covenanted with A. to pay an annuity to him of £60 for life and £3000 *to other persons* in the event of B.'s marrying, the covenant *did not create a lien on the real estate in favor of the persons entitled to the* £3000." (*See also* 1 *Mylne & K.* 276, 310.)

In the text of Story above cited, it is said, "if the consideration of the conveyance is a *covenant to pay an annuity* to the vendor, and another covenant to pay a part of the money *to third persons*, it seems that the latter, not being parties to the conveyance, will not generally have any lien for the payment of such money ; for they stand in no *privity to establish a lien*, at least unless the original agreement import an intention to create such a lien."

By the English rule the doctrine of equitable lien depends upon the circumstances of the case, even as between vendor and vendee.  If in the place of a covenant or agreement to pay so much as purchase money, the vendor receives the personal covenants of the vendee *for the price, or as a mode of payment of the consideration,* the land is discharged of the lien.  In the case of *Clark* v. *Royle,* (*supra,*) the vice chancellor held that the £3000 was not a charge upon the land; that A. conveyed the land to B. so that the deed plainly imported, that the consideration on the one side was the conveyance, and on the other

McKillip *v.* McKillip.

the *entering into the covenants.* Sir Edward Sugden, (*cited in Miller on Equitable Mortgages, vol.* 22, *Law Lib. p.* 20,) in remarking on this case says, "the conveyance really was made in consideration of the covenants entered into by the same deed, *for the payment of the price;* and it may be considered against the bearing of such security for the purchase money, to raise another upon the estate itself, by implication from the very transaction. There is a marked distinction between a conveyance as for money paid, with a separate security for the price, whether by covenant, bond or note, and a conveyance expressed to be in *consideration of covenants entered into by the purchaser.*" Miller, in his treatise above cited, page 23, holds this language, " As a further instance to show that the general rules with regard to these liens must bend to particular circumstances, we may also refer to the decision in *Parrott* v. *Sweetland,* (3 *Myl. & K.* 655.) In that case the vendor in lieu of £3000, (the purchase money,) agreed to accept £100 for the joint lives of herself and her intended husband, if the purchaser should so long live, to be secured by the bond of the purchaser, which provided for the payment of the £3000 in certain events, and the receipt indorsed on the conveyance was expressed to be ' a bond for £3000, being the full consideration within expressed to be given ;' it was held that this was not a case of security, but a *substitution for the price,* what the vendor had agreed to accept, and that the *lien for the purchase money was consequently discharged.*"

The case at bar is analogous in principle and in some of its facts to the cases above cited. There are no adjudications in our American courts, that I am aware of, conflicting with the doctrine of those cases, and hence they may be adopted as the law of this case. The principle is salutary, and limits the law of equitable lien within reasonable bounds. Trusts of this kind are implied because it is supposed to be in furtherance of the intention of the parties. Such intention rarely exists in fact, even in cases where the lien may be clearly enforced. In most cases the operation of the rule proceeds upon a false legal implication, and therefore the doctrine should not be extended be-

yond the vendor and vendee, and privies in estate or in law, and then only for *unpaid purchase money*. Where a covenant of the vendee is substituted for the purchase money, or as a mode of payment of the price of the land, the land should be held discharged of the lien. The case before us comes within this rule. The obligor in the bond covenanted to maintain the obligee and the lunatic during their natural lives. *This was the substituted consideration for the purchase money*. The damages resulting from a breach of the bond is not *purchase money*, in any sense. It follows, therefore, that the bond could not be declared an equitable incumbrance on the land, even in behalf of the *obligee*, Archibald, and *a fortiori* in behalf of the lunatic, who is merely a beneficiary.

The decree dismissing the bill must be affirmed with costs.

