NARRAGANSETT STEAMSHIP CO. v. CONNOLLY. See Case No. 1,891.

NARRAGANSETT STEAMSHIP CO. v. PONTON. See Cases Nos. 1,890 and 1,892.

NARVAEZ (UNITED STATES v.). See Case No. 15,855.

NASBAUM v. EMERY. See Case No. 10,381.

## Case No. 10,021.

### NASH v. LE CLERCQ et al.

[2 Cin. Law Bul. 146.]

Circuit Court, S. D. Ohio. 1877.

BANKRUPTCY — FRAUDULENT CONVEYANCES — SUIT TO SET ASIDE — VENDOR'S LIENS — DEED WITH CONDITION SUBSEQUENT.

[1. A mortgage given by a debtor to secure his indorsers, a few days before making an assignment, and under circumstances putting the grantees upon inquiry as to his financial condition, is void under the bankruptcy law, as creating a fraudulent preference; and such a mortgage cannot be sustained, as made in pursuance of a prior agreement to give security, unless that agreement was definite and specific as to the property to be mortgaged; in other words, such an one as a court of equity would enforce upon a bill for specific performance. Jackson Iron Co. v. Manufacturing Co., Case No. 7,153, followed.]

[2. A mortgage given to secure a prior loan three months before the debtor's assignment, but while he is still struggling to meet his liabilities, and when the mortgagee has no good reason to believe that these efforts will not succeed, is not void under the bankruptcy law as creating a fraudulent preference.]

[3. While the receipt of a personal note, bond, or other obligation of the vendee is no waiver of the vendor's lien, yet the taking of the obligation of a third party, or of a mortgage upon the property sold, or upon any other property, constitutes a waiver.]

[4. A conveyance made partly in consideration of the grantee's covenant to assume and discharge all indebtedness against the grantor growing out of a previously existing partnership between them does not create an implied lien upon the land, for the purpose of indemnifying the vendor in case the covenant is not performed, especially as the time of performance and the amount to be paid are indefinite, and depend upon a contingency.]

[5. A partner, upon withdrawing from the firm, conveyed his interest in the firm property, including real estate, to the remaining partners, "subject to his proportion of the debts and liabilities of said firm." The habendum clause was as follows: "The said [grantees], assuming and agreeing to pay my said interest's share of the debts and liabilities of the said firm, to have and to hold' my said interest. being the undivided one-third part of the property, * * *: but subject to said interest's share of the debts and liabilities of said firm," etc. Held, that this was a conveyance upon a condition subsequent. and that upon failure to perform the condition a right of re-entry arose, although none was expressly reserved, and that consequently the vendor had a lien thereon superior to subsequent mortgagees, who must be held to have taken with notice of the condition.]

This was a bill in equity [by Samuel A. Nash, assignee], to set aside a number of mortgages upon the property of Francis L. Le Clercq and James A. Le Clercq, doing business under the firm name of Le Clercq Bros., and upon the separate property of the individual members of said firm. Seventeen answers were filed by persons claiming different interests in the property.

Before BROWN and SWING, District Judges.

BROWN. District Judge. No question is made with regard to any of the numerous

mortgages in this case, except those of the Fords, Adam Uhrig, James W. Steinberger, H. H. Menager and Roman Menager.

1. As to the mortgage to H. N. and Mary E. Ford. It seems that in November, 1872, H. N. Ford endorsed a note of Le Clercq Bros. for $800, discounted by Charles Creuzet, upon which Ford was afterward sued and a judgment rendered against him. In December, 1872, he endorsed another note for $750, discounted by the Ohio Valley Bank, which was subsequently renewed by the endorsements of himself and wife, and paid in January or February, 1874. January 10, 1873, Ford and wife endorsed still another note for $3,000, to be used by the firm as collateral security for loans to be made by the same bank. These loans were afterwards made, to the amount of $3,000, and paid by the Fords at the same time the note for $750 was paid. This last note was endorsed upon the faith of a promise of the firm to give a mortgage upon their real estate, to indemnify the Fords against their entire liability for the firm. Their clerk, under their instructions, drew up a mortgage upon the individual property of Francis Le Clercq, which was never signed, but was afterwards destroyed, and a mortgage finally given bearing the date September 2, 1873, which was not recorded, however, until October 7th, the day of, or the day before, the assignment. I think there is no doubt that the firm was actually insolvent within the meaning of the bankrupt law at the time this mortgage was given. They had been engaged in operating a woolen mill in Gallipolis; had suspended work in the spring of 1873, and had not resumed up to the time of the assignment, except about a month in the summer, when the mill was engaged in doing some small jobs for the country people about there. Their note for $25,000, due March 4th, 1873, had been returned dishonored. Another note for $500, endorsed by Uhrig, was protested September 14th, and was subsequently taken up by Uhrig. Another note for $1,000, endorsed by him, became due October 4th. Another note for one Bray was protested October 6th. After the closing of the mill in the spring, the Le Clercqs, finding themselves embarrassed, made ineffectual efforts to organize a corporation, and finally, October 7th or 8th, made a general assignment to Ford for the benefit of all their creditors. While it is not free from doubt, I think there is a preponderance of evidence showing that Ford had reasonable cause to believe that the firm was insolvent at the time the mortgage was given. He was the brother-in-law of the Le Clercqs, and lived in the other part of a double house occupied by Francis Le Clercq. He had endorsed for them in November and December, 1872, and in January, 1873. Whenever any of these notes became due, they were renewed. Nothing was ever paid upon either of them from the time of the first endorsement. When the $800 note, upon which he was endorser, became due, Le Clercq's agent

brought it to him and he waived the protest; that, he says, was the last he heard of it until after the assignment. He does not recollect whether he ever saw the mortgage until after it was recorded, viz. about the time of the assignment. Living within three-quarters of a mile of the mill and next door to Francis Le Clercq, his brother-in-law, it is scarcely possible that he should not have known of the suspension of business during the summer, or of Le Clercq's efforts to organize a joint stock company, and that they were not paying their debts in the ordinary course of business, while the fact that the mortgage was not taken until a few days before the assignment, would seem to indicate that if he had been aware of the contemplated assignment, he would have taken it sooner. It is explained in his testimony that he supposed a mortgage had been given at the time the endorsements were made, and had relied upon that for his protection. We must then hold this mortgage to have been a fraudulent preference, unless it can be supported upon the theory that it was executed in pursuance of a prior agreement. Having had recent occasion in the case of Jackson Iron Manuf'g Co. [Case No. 7,153], to examine the question under what circumstances a mortgage will be sustained if made in pursuance of a prior agreement to give security, I then came to the conclusion, after a careful examination of the authorities, that to support such a mortgage the agreement must be definite and specific; such a one as a court of equity would enforce upon a bill for specific performance. In the case under consideration, the Fords endorsed the note for $3,000 upon the promise of Le Clercq to give a mortgage, but the property which the mortgage was to cover was not specified, and remained entirely uncertain until the mortgage was executed. In fact, a mortgage was drawn up by Wilson, a clerk of the firm, upon the individual property of one of the partners, but was never signed, and was subsequently destroyed. The mortgage afterward executed covered the mill property belonging to the firm, and cannot be said to have been executed in pursuance of a prior agreement. I think the circumstances were such as to put Ford upon his inquiry, and to constitute reasonable ground for believing the firm to be insolvent. The mortgage must be held invalid as a preference.

2. The mortgage to Adam Uhrig was given under very similar circumstances. Some time in April or May, 1873, one of the firm applied to Uhrig to endorse their note of $1,000, payable in sixty days. It was renewed at maturity, and Uhrig again became security for the further sum of $500, which notes were renewed from time to time until October 4th, when new notes were given for $500 and $1,000 respectively, payable in ninety days. The mortgage was given October 6th, but a day or two before the assignment. Uhrig knew that none of the notes which he had endorsed had been

paid at maturity; that the business of the firm had been suspended for several weeks before the execution of the mortgage, and he says he took the mortgage at the time because he found the firm was not in as good condition as when he endorsed the notes. There was also evidence tending to show that he had heard it said that the firm was liable to be adjudged bankrupts at any time. It seems that in this case also the endorsements had been made upon the promise of Le Clercq to give a mortgage of indemnity upon his real estate, but the promise was, if possible, less definite than that to Ford. There was no property specified, and no attempt made to procure the mortgage until a day or two before the assignment. I think that Uhrig must have known at this time that the firm was in extremis.

3. As to the mortgage to John W. Steinbergen, administrator, in 1871, Steinbergen having in his hands $1,000, belonging to the estate of Joseph Spencer, loaned the same to the Le Clercqs, taking their note endorsed by Rosena Le Clercq, their mother. The note was made payable a year from date, but we think the evidence shows that it was intended for an investment; that there was no desire or expectation that it would be promptly paid, and, in fact, Steinbergen told the firm, before the year was up, that the note might run another year. In May, 1873, the interest being due, he called for it. Le Clercq told him that he was a little pressed at that time, but would pay in a few days. Calling a second time, and not getting it, he requested a mortgage, and after some delay a mortgage was executed and delivered to him, bearing date June 30th, 1873. I am not satisfied that Steinbergen had reason to believe the firm was insolvent at the time this mortgage was given. Both LeClercq and Steinbergen deny it in most unequivocal and explicit language. The latter says, that he had heard they were embarrassed, but supposed and believed that their property would pay their debts. He says he does not remember hearing they could not get along, but did hear it said that it would be better for them to make a sale of their mill. Efforts were then being made to organize the joint stock company, and had not at that time failed. The only circumstance that would naturally put Steinbergen upon inquiry, was the fact that he was director of the Point Pleasant Bank, which had taken a mortgage from Le Clercq on the 5th of May, to secure a note for $2,065, and it seems that he knew this mortgage had been taken. He swears, however, that his real reason for taking the mortgage was that he had understood that the endorser upon the note had been traveling, and had spent more than her income; that she was liable to become irresponsible, and he deemed it his duty as trustee to take additional security. As a matter of fact, business men are usually more likely to look out for the security and safe

investment of money which they hold in a fiduciary capacity, than for that which belongs to themselves individually. We are disposed to accept this theory of the case as the true one, and to sustain the mortgage. While the firm was undoubtedly somewhat embarrassed at the time it was given, they were evidently struggling to meet their liabilities and Steinbergen had not, then, good reasons to believe they would not succeed.

As to the claim of H. H. Menager, it appears that on the 17th day of November, 1869, Menager being the owner of certain real estate in West Virginia, sold the same to L. Le Clercq for $16,000, taking in part payment certain real estate in Gallipolis, at a valuation of $12,000. For the remaining fourth, Le Clercq gave his unsecured note. A settlement was had April 17, 1873, upon which there was found to be due $552. A new note was given for this amount, and as the note is still unpaid, Menager claims a vendor's lien upon the land. The land was afterwards incumbered by a mortgage, taken without notice of the vendor's lien, and it is conceded that Menager's claim is subject to this mortgage. That the vendor has a lien upon land sold for the purchase money, is now too well settled to admit of any doubt. Repeated adjudications of the supreme courts of Ohio and of West Virginia have firmly established the principle in those states. Tiernan v. Beam, 2 Ohio, 383; Neil v. Kinney, 11 Ohio St. 66; Brush v. Kinsley, 14 Ohio, 24; Edwards v. Edwards, 24 Ohio St. 411; Boos v. Ewing, 17 Ohio, 500; Redford v. Gibson, 12 Leigh, 332; Sinnett v. Cralle's Adm'r, 4 W. Va. 600. No security having been taken for the purchase money, we see nothing to indicate that the lien has been waived. The assignee, taking the property as he does, subject to all just liens, will be required to pay the amount of this claim, after payment of the mortgage.

As to claim of Roman Menager. He also claims a vendor's lien upon the woolen mill property in Gallipolis. The facts are substantially as follows: On September 7, 1870, Menager sold an undivided one-third of this property to the Le Clercq brothers, in consideration of which they secured to him by mortgage upon their property $16,000, as a part of the consideration, and for the residue thereof agreed to pay and discharge all indebtedness that then existed against Menager growing out of a firm partnership existing between the Le Clercqs and him. For this covenant Menager took no security or indemnity. At the time of this sale there existed an indebtedness growing out of the former partnership to one Samuel Couch for $1,178, for which Menager was liable. On January 12, 1875, he was compelled to pay this indebtedness which then amounted to $1,374.33. For this amount he asks a lien upon the property. It is admitted that by reason of a clause in the deed hereinafter mentioned the other mortgagees took with notice of this lien, if any

such existed. There can be no pretense of a lien so far as the $16,000 is concerned, for which an independent mortgage was taken. While the receipt of a personal note, bond, or other obligation of the vendee is clearly no waiver of lien, the receipt of the obligation of a third party, or the taking of a mortgage upon the property sold, or upon any other property, constitutes a waiver.

We think there is no implied lien in favor of the vendor for the remainder of the consideration, viz. the payment of that proportion of the debts for which Menager was liable. There is a marked distinction between a conveyance as for money paid with a separate security for the price, whether by covenant, bond, or note, and a conveyance expressed to be in consideration of a covenant entered into by the purchaser. Where, as a part of the consideration of the deed, there is a covenant to perform some collateral undertaking, especially if the time of the performance or the amount to be paid is indefinite, or dependent upon a contingency, there is no lien. In Clarke v. Royle, 3 Sim. 499, A. conveyed an estate to B., in consideration of B. entering into the covenant contained in the deed, for paying an annuity to A., and three thousand pounds to certain persons in the event of B. marrying, and it was held the covenant did not create a lien on the estate. "The deed plainly marks out that the consideration on the one side was the conveyance of the estate, and on the other the entering into the covenants." In Parrott v. Sweetland, 3 Mylne & K. 655, a vendor, in lieu of the price of three thousand pounds, agreed to accept an annuity of one hundred pounds for the joint lives of her intended husband and herself, in case the purchaser should so long live, the purchaser engaging that his personal representatives should within three months after his decease, in certain events, pay a further sum of three thousand pounds. This was held to be not a security, but a substitution for the price, and the lien of the vendor on the land was discharged. See, also, Buckland v. Pocknell, 13 Sim. 406. In Brawley v. Catron, 8 Leigh, 522, by agreement between the vendor and vendee of land, the vendee engaged, in consideration of the land, to pay off certain debts of the vendor, and to support him during his life, and two of his daughters until their marriage. Held, the agreement for supporting the vendor and his daughters constituted no lien upon the land. In McKillip v. McKillip, 8 Barb. 552, where A. conveyed land to B., and in consideration thereof B. covenanted with A. to support and maintain him and his lunatic son, the covenant was held to create no lien upon the land in favor of the son. In discussing the question of the vendor's lien, the court observed: "The doctrine should not be extended beyond the vendor and vendee, and privies in estate or in law, and then only for unpaid purchase money. Where a covenant of the vendee is substi-

tuted for the purchase money, or as a mode of payment of the price of the land, the land should be held discharged of the lien." In Patterson v. Edwards, 29 Miss. 67, a conveyance was made in consideration of the vendee's assuming to pay the principal and interest on certain notes, and it was held the lien was lost. "If the obligation consist of a collateral covenant, or be for the discharge of a liability to a third party, no lien is retained when the conveyance is absolute; and where the obligation of the vendee to discharge such liability appears to be substituted for the purchase money, the lien is lost." Had this deed been made simply in consideration of the sum of $16,000, and of the agreement of the vendee to pay the debts for which Menager was liable I should find no difficulty in holding there was no lien. It is insisted, however, that as the conveyance was made subject to the payment of these debts, there is thereby created a condition subsequent, for the breach of which there exists a right of re-entry, and consequently a lien. The recital of the consideration of the deed is, "Subject to his proportion of the debts and liabilities of said firm, so fully and entirely that said Francis L. Le Clercq and James A. Le Clercq stand in the place of Roman Menager thereto, taking his interest in and being liable for said interest's share of the losses, debts and liabilities of said firm." The habendum clause is as follows: "The said Francis L. Le Clercq and James A. Le Clercq, assuming and agreeing to pay my said interest's share of the debts and liabilities, of the said firm, to have and to hold my said interest, being the undivided one-third part of the property, real, personal, and mixed, above described unto the said Francis L. Le Clercq and James A. Le Clercq, their heirs and assigns; but subject to said interest's share of the debts and liabilities of said firm of Le Clercq & Co., which interest's share thereof the said Francis L. Le Clercq and James A. Le Clercq agree to pay and bear."

It is insisted that this is a grant upon a condition subsequent and that upon the non-performance of this condition, the grantor has a right to re-enter without express reservation of such right, and consequently a right of lien. While it is very doubtful whether the defendant has a right to avail himself of this condition under the allegations of his answer, as this objection was not made by the complainant upon the argument or in his brief, I feel authorized to take the question in consideration. It is frequently a matter of great difficulty to determine whether words of this nature, inserted in a grant, are to be construed as qualifications of the estate granted, running with the land, or merely as personal covenants, binding only upon the grantee. With some hesitation we have come to the conclusion that the words in this deed were intended to create a condition subsequent. In Heist v. Baker, 49 Pa.

St. 9, the deed contained the provision, "under and subject to the payment" of a sum of money at the decease of a widow, to the children named, and it was held the purchaser took subject to an express lien for the amount. In Wolveridge v. Steward, 3 Moore & S. 561, also 1 Cromp. & M. 654, certain premises were assigned, subject to the payment of rent and to the performance of covenants and agreements reserved and contained in the original lease. It was held that the lessee was not liable in an action of covenant upon the grant, and that the words "subject to payment of rent," etc., were words of qualification, and not of contract. So, also, in Sanborn v. Woodman, 5 Cush. 36, a condition in a deed of land subject to a mortgage that the grantee should indemnify the grantor from the payment of the principal and interest secured by mortgage, was held to be broken by failure to pay interest when due, and that the grantor on paying the interest might immediately enter upon the land for breach of condition. In Stone v. Ellis, 9 Cush. 95, a deed contained the following clause: "The above premises are subject to mortgage, etc., and are conveyed upon the condition that the said grantee, his heirs and assigns, do assume and pay the same debt." It was held to create an estate upon condition, which, if not performed, would entitle the grantor to enter for a forfeiture. See, also, Tayl. Landl. & Ten. § 372; Kline v. Bowman, 19 Pa. St. 24. It is true that in this case there is no right of re-entry in terms reserved, but this seems to be unnecessary where the condition of a grant is express. Washb. Real Prop. bk. 1, c. 14, § 15; Gray v. Blanchard, 8 Pick. 291; Jackson v. Allen, 3 Cow. 220; Wheeler v. Walker, 2 Conn. 201. It seems to follow from these authorities that the right to re-enter for nonperformance of a condition subsequent creates a lien upon the premises, which may be enforced in this proceeding. Stephenson v. Haines, 16 Ohio St. 478. Under all the circumstances, we think that Menager must be held to have a lien upon the premises, and inasmuch as the subsequent mortgages took with notice of his rights, contained in the original deed, he must be preferred to these mortgagees, so far as an undivided one-third of this property is concerned.

We do not wish to be understood as expressing any opinion with regard to the sufficiency of the bill in this case. We have not had occasion to pass upon a bill praying, as this does, for the cancellation of separate mortgages upon distinct parcels of property, owned by different persons, none of the defendants apparently having any common interest in the question litigated. We assume that the litigation is amicable, at least so far as the form of the proceeding is concerned, or a demurrer would have been interposed by some of the twenty-three defendants for multifariousness. A decree will be entered in conformity with this opinion.