Earl, J.
I have no doubt that a valid trust was created by the defendant Gordon by the instrument of April 19,1876. The trust was declared by deed in writing, as required by the Revised Statutes, 2 R. S., 134, §§ 6 and 7. It was not necessary that the deed should be based upon any consideration, or that it should be delivered. Fisher v. Fields, 10 Johns., 495; Wright v. Douglass, 7 N. Y., 564; Cook v. Barr, 44 id., 156; Van Cott v. Prentice, 104 *387 id., 45; 5 N. Y. State Rep., 654; Montague v. Hayes, 10 Gray, 609; Urann v. Coates, 109 Mass., 581; Adams v. Adams, 21 Wall, 185; 1 Perry on Trusts, § 82.
This trust must be treated as originating with Gordon. It was declared by him, and there is no evidence of any trust declared or created by Miss McDonal. The deed from her, however, may be considered for the purpose of showing the inducement of the declaration of trust by Gordon, and as one of the circumstances bearing upon the construction of that declaration.
The trust was not only properly created, but it is an express, active trust authorized by and specified in § 55, 1 R. S., 728.
On the part of the plaintiff it is contended that Larmouth was not bound to take his support upon the farm which, by the declaration of trust, is charged with such support, and so the courts below held, and in this, I think, they erred.
We are dealing with a situation contemplated and provided for in the trust deed. Gordon has sold the farm, and hence the proper maintenance of Larmouth in board and clothing is charged thereon and made the first lien during his life, and so long as the defendants were willing to support Larmouth in a comfortable and suitable manner upon the farm, he had no right to demand it elsewhere. There is no fixed rule for the construction of such a trust as this. The intention of the creator of the trust, as it can be gathered from the instrument declaring it, and the surrounding circumstances, must control. This trust was voluntarily created by Gordon, and the sole question for our determination is, what did he mean when he voluntarily bound himself to appropriate the net rents of the farm for the comfortable support of Larmouth, or if he sold the farm that Larmouth’s proper maintenance in board and clothing should be the first lien upon the same? Larmouth had always lived upon this farm, and it was his home at the time the trust was declared. It is not reasonable to suppose that Gordon meant to assume the obligation to take the net proceeds of this farm and apply them for the support of Larmouth wherever he might choose to take such support. He was an incompetent person, incapable ■of taking care of himself, and it must have been the intention of Gordon that he should remain upon the farm where he could look after and watch over and provide for him in the manner in which he had been provided for before, and such probably was the expectation of Larmouth’s mother when she executed the deed to Gordon. It is quite true that covenants for the support generally of a person of full age, and competent to take care of himself, require such support to be furnished where the person to be supported wishes to take it, and that the party bound to furnish the support cannot insist that the person to be supported shall live in his family or at any particular place. That is the rule in reference to capable adults, not members of the obligor’s family; but in cases of minors and persons incompetent to take care of themselves the courts have given a different construction to such ^covenants.
In McKillip v. McKillip, 8 Barb., 552, the facts are very similar *388 to those we have here. There Archibald McKillip conveyed to his son John McKillip real estate, and in consideration thereof John executed- to his father a bond, the condition of which was. that if he, his heirs, executors or administrators, “ shall and do at all times hereafter maintain, support and clothe the said Archibald McKillip and his son James, who is now ill and deprived of his reason, during their natural lives, and during the natural life of the longest liver of them, and furnish good and sufficient nursing and medical attendance, washing and lodging, both in sickness and health, for each of them during the term aforesaid, then this obligation to be void and of no effect, otherwise to remain in full force and virtue.” The defendants in the action were the widow and heirs at law of John McKillip, the obligor. The plaintiff was the administrator of Archibald, one of the obligees, and also the committee of the lunatic James. It appeared in the evidence that. John McKillip, the obligor, had from the time of the execution of the bond, and up to his death, maintained his father and brother at the homestead upon the premises conveyed as the consideration of the bond, and that after his death the defendants, as his widow and heirs at law, offered to continue such maintenance according to the condition of the bond at their residence; but Archibald declined the offer, and went to live with the plaintiff, and was supported by him. This was done without the consent or approval of the defendants. The action was brought by the plaintiff to recover for the maintenance and support furnished by him to Archibald and James, and he prayed judgment that payment might be decreed to be made for the amount which the plaintiff was justly entitled to demand and receive on account of the indebtness set forth in the complaint, and, in default of payment, that the real estate referred to in the bond might be sold, and an equitable lien thereon be decreed for the support and maintenance of Archibald and James. The court held that the obligor by his bond was bound only to maintain and support the obligee and his son at his own dwelling-house, provided it could be done there in a suitable manner, and that after the decease of the obligor, the family residence, so long as it was maintained, was the place of support. Hubbard, J., writing the opinion, said: “Looking at the situation of the parties and the-relations existing, it is manifest that the intent of the bond was that Archibald and James should become and remain inmates of the family of John, the obligor, and that he was to support and provide" for them at his own house. After his decease, the family residence, so long as it was maintained, was obviously intended as the place of future support The plaintiff has plainly misconceived the real object and intent of this family arrangement, and has erroneously regarded this as a money bond, and that the residence of Archibald and James was a matter discretionary with them, or subject to the interference of any third person.” The opinion of Judge Hubbard was concurred in by Judges Gridley and Allen, and the case has been frequently cited and, so far as I can discover, never questioned.
In Pool v. Pool, 1 Hill., 580, the plaintiff, a man of advanced *389 age, transferred a house and some other property to the defendant and another, his two sons, they covenanting to pay his debts and to support him during life'j also to keep and maintain his two younger children, one of them then eleven years old, until they should arrive at the age of twenty-one, “in a manner suitable for the said Pool to provide for them in case he should live and had not conveyed away his property.” The youngest child having remained with the defendant six years under this arrangement, left him and did not return; and it was held that the plaintiff could not recover for his board or clothing after he had thus left, the covenant, in effect, only binding the defendant and his brother to provide for him as a member of the family. Bronson, J., writing the opinion of this court, said : “ If we look at the contract in connection with the facts as they existed at the time, there can be no great difficulty in understanding what the parties meant by this family arrangement. The plaintiff, being then about sixty-eight years old, transferred his little property to his two sons, Abraham and John, on their undertaking to pay his debts and provide for him for life, and on their further agreeing to provide for the plaintiff’s two younger children, Jeremiah and Dorothy, until they should respectively attain the age of twenty-one years. The two sons were of course to have possession of the house and other property and I think it quite evident that the plaintiff was to live with them. Such also must, I think, have been the intention in relation to the two younger children. Abraham and John were to “ keep and maintain,” or as it is afterwards expressed “ keep and provide for them; " and it was to be done “in a manner suitable for the said John Pool (the father) to proyide for them in case he should live and have not conveyed away his property.” In short the intention seems to have been that Abraham and John should become the head of the family and should stand in loco parentis to the two younger children. The property which the two sons received aid not exceed $450 in value after the payment of debts and it is impossible to suppose that they were to provide for the two children in any other way than as members of their family.”
In Loomis v. Loomis, 35 Barb., 624, the facts were as follows: Hezekiah Loomis by an ante-nuptial agreement executed by him and his intended wife bound himself, his administrators and executors, to give her “ a good and sufficient maintenance during her natural life; ” and it was held that after the death of the husband his widow had a right to choose her place of residence and that her husband’s executor had no right to control her choice or to refuse to provide for her support unless she would reside at his own house and with his own family or at another house specified by him. In that case, prior to the commencement of the action, the plaintiff applied to the defendant as executor and demanded of him that he should provide and pay for her support and maintenance under and in pursuance of the ante-nuptial agreement. The defendant offered to support the plaintiff at his own house with his own family, but refused to provide or pay for her support or maintenance at any other place. She refused to live with him and *390 so notified him and claimed the right to elect ,where she should reside; and the court looking at the ante-nuptial agreement and the surrounding circumstances held that they did not indicate that the plaintiff was to be maintained at any particular place after the death of her husband. Balcom, P. J., writing the opinion, referred to the case of McKillip v. McKillip, and in distinguishing it from the case he was then deciding laid stress upon the fact that the person to be supported was deprived of his reason and was not competent to select where or how he would be supported or kept.
Not only do the surrounding circumstances here indicate an intention that Larmouth should have his maintenance upon the farm, but the same inference follows from the language of the deed of trust. His support is made a lien upon the farm, and it must be the general rule that where a farm is conveyed to a grantee who binds himself to support the grantor, or some other person, then living upon the farm out of the income of the farm, and such support is made a lien upon the farm, the support must be furnished and taken upon the farm. Such I think would be the common understanding of such language so used, and such should be the construction thereof unless the circumstances of the case require or justify a different construction. ■
My conclusion therefore is that if the defendants offered, and were ready and willing to support Larmouth upon the farm in a proper and suitable manner, the action cannot be maintained against them. The action was not commenced or tried on behalf of the plaintiff, or decided, upon the theory that Larmouth had been refused proper support upon the farm, and there was no "proof justifying any judgment against them upon that theory.
I have not been careful to .distinguish between the two defendants and have deemed it sufficiently accurate for the purposes now in hand to spealc of them jointly or generally. Their obligations to each other, or their separate obligations to Larmouth are not, in the view I take, of any present consequence.
The judgment of the general and of the special terms should be reversed and a new trial granted, costs to abide event.